**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 06-cv-01989-CMA-KLM

CHARLES LEE KETTERING,

     Plaintiff,

v.

DEPUTY GREGORY HARRIS, in his individual and official capacity,
SERGEANT MICHAEL ESTERS, in his individual and official capacity,
DEPUTY CLYDE MEEKS, in his individual and official capacity,
DEPUTY ROBERT MOLL, in his individual and official capacity,
SERGEANT JEFFREY VANFLEET, in his individual and official capacity,
CORPORAL JOHN HARTEKER, in his individual and official capacity,
DEPUTY JOSEPH PUGLIESE, in his individual and official capacity,
DEPUTY CANDIDO MARTINEZ, in his individual and official capacity,
DEPUTY SANTOS ROMERO, in his individual and official capacity
DEPUTY JEFFREY ARMENTROUT, in his individual and official capacity,
DEPUTY AARON SMOYER, in his individual and official capacity,
DEPUTY THERESA MCHUGH, in her individual and official capacity,
DEPUTY RHETT PURRIER, in his individual and official capacity,

     Defendants.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

     This is a prisoner's, or a pretrial detainee's, civil rights action. Plaintiff Charles Lee Kettering alleges that the above-captioned Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by using excessive force against him on September 6, 2005, November 26, 2005 and April 19, 2006, and by subjecting him to inhumane conditions of confinement from November 8, 2005 to November 11, 2005. Beginning on January 12, 2009, the Court held a four-day bench trial in this matter. The Court now enters its findings of fact and conclusions of law.

**FINDINGS OF FACT**

**1.** **_Plaintiff's Extradition_**

In the fall of 2003, Plaintiff was involved in criminal proceedings in Larimer County, Colorado. On the eve of a scheduled court appearance, Plaintiff absconded, and he remained on the run for approximately twenty-one months.

In May 2005, after spending time in Colorado Springs, Colorado, and Tennessee, Plaintiff was apprehended in San Lorenzo, California. During the course of his apprehension, Plaintiff was involved in a physical altercation with police during which he lost most of his two front teeth. In June 2005, Plaintiff was extradited back to Larimer County, Colorado, pled guilty to two criminal charges, and was sentenced to a term of imprisonment.

**2.** **_Plaintiff's Initial Detention at Larimer County Detention Center ("LCDC")_**

From June 2005 to June 2006, Plaintiff was detained at LCDC in Fort Collins, Colorado. In August 2005, Plaintiff began experiencing dental pain relating to his damaged front teeth. In time, Plaintiff became dissatisfied with the quality of his dental care, including his prescribed medications, and his access to non-facility dentists. On September 5, 2005, Plaintiff filed a grievance regarding the amount of an oral rinse an LCDC nurse had provided him during her medical rounds.

**3.** **_September 6, 2005 Incident_**

On September 6, 2005, Plaintiff had a verbal altercation with this same nurse after she again allegedly provided him with an insufficient amount of oral rinse. Plaintiff testified that he acted with restraint during this verbal altercation, but the Court

2

discredits such testimony in light of Plaintiff's observed demeanor at trial, and the voluminous reports of his abusive and threatening behavior toward LCDC staff outlined below. Instead, the Court credits Deputy Michael Burgess's report that Plaintiff was "verbally abusive" to the nurse during this altercation. (Defs. Ex. 131.)

Following the verbal altercation, Deputy Burgess told Plaintiff that his behavior toward the nurse had been unacceptable. When Plaintiff continued to argue with and interrupt Deputy Burgess, the deputy ordered Plaintiff into a conference room. Deputy Burgess then notified Sergeant Michael Esters that Plaintiff needed to be transported to booking.

Booking is an area of LCDC where inmates who are entering or exiting the facility are processed. The area contains an observation cell, a safety cell, and multiple booking cells. LCDC also uses booking for disruptive inmates who need to cool down, to be monitored by LCDC staff, or to be removed from the housing pods to minimize disruption to the other inmates.

### a. Alleged Improper Handcuffing

As Plaintiff waited in the conference room, Sergeant Esters, Deputy Gregory Harris and an unknown third deputy arrived to transport him to booking. According to Plaintiff's testimony, Deputy Harris ordered him to stand with his arms against the wall, and then handcuffed his arms behind his back in an improper manner. Specifically, Deputy Harris allegedly handcuffed Plaintiff with the handcuff chain facing the wrong direction on Plaintiff's wrists, thus forcing his shoulders together in painful contortion.

According to Deputy Harris's testimony, the deputy placed the handcuffs on Plaintiff's wrists with the chain facing the correct direction, and he double locked the handcuffs to prevent them from tightening on Plaintiff's wrists. Sergeant Esters, who witnessed the handcuffing, corroborated Deputy Harris's testimony. An LCDC investigator who interviewed Deputy Harris after the incident wrote that Deputy Harris claimed "[Plaintiff] 'tensed up' and [Deputy] Harris had to use both hands to secure [Plaintiff's] left arm behind his back."[1] (Defs. Ex. 203.) Deputy Burgess, who also observed the handcuffing, reported that Plaintiff "was resisting" while being placed in the handcuffs. (Defs. Ex. 131.) Although Deputy Harris confirmed the accuracy of Deputy Burgess's report, he did not recall having used two arms to pull down Plaintiff's left arm.

The Court finds both Deputy Harris's and Sergeant Esters's testimony to be credible. Accordingly, the Court finds that Deputy Harris handcuffed Plaintiff with the handcuff chain facing the correct direction on Plaintiff's wrists and that he double locked the handcuffs to prevent them from tightening. Similarly, because Deputy Harris does not directly dispute Deputy Burgess's report, the Court finds that Plaintiff was resisting while being handcuffed, and that Deputy Harris used two arms to pull Plaintiff's left arm behind his back during this handcuffing.

Conversely, the Court discredits Plaintiff's testimony that Deputy Harris handcuffed his wrists in an incorrect manner. Both Deputy Harris and Sergeant Esters testified that Deputy Harris used the standing modified handcuffing technique, which

---

[1] The parties stipulated to the admissibility of all LCDC reports cited in this decision, thus obviating the necessity of determining whether such reports contain inadmissible hearsay.

requires an inmate to stand with his legs apart and fingers interlaced behind his head prior to handcuffing. Both Deputy Harris and Sergeant Esters further testified that an inmate would never be ordered to place his arms against a wall prior to handcuffing because this would unduly endanger the officer giving the order. Specifically, Sergeant Esters testified that an inmate with his hands on a wall would present a "safety concern" because he could use the wall as leverage, and because the officer would lack control over the inmate's arms. As Deputy Harris testified, "you have no control of an inmate if he decides to swing at you, turn on you, to attack you."

Based on Plaintiff's observed demeanor at trial, and the inherent implausibility that Deputy Harris ordered him to place his hands on the wall in light of the danger this order would have posed to Deputy Harris, the Court finds that Plaintiff's testimony regarding the manner in which he was handcuffed is not credible.

### b.   *Alleged Excessive Force During Transport to Booking*

Once Plaintiff was handcuffed, he was escorted to booking by Deputy Harris, Sergeant Esters, and the unknown third deputy. According to Plaintiff's testimony, Deputy Harris and the unknown third deputy engaged in "a tug of war [using his] arms as the rope" while transporting him to booking. Specifically, Deputy Harris and the unknown third deputy allegedly pulled his two arms in opposite directions after claiming that Plaintiff was resisting them, and any true resistance was due to the other deputy's actions. Moreover, Sergeant Esters allegedly smiled at Plaintiff during transport and stated, "I'm going to show you, Mr. Kettering, that you don't have any control of what happens to you or what you get in here."

According to Deputy Harris's testimony, Plaintiff was "jerking around" during transport, and he felt Plaintiff's arm "tensing up." As a result, Deputy Harris allegedly exerted upward pressure on Plaintiff's wrist in order to better control him. Moreover, Deputy Harris testified that such control was necessary to avoid ending up in a fight with Plaintiff on the floor. Sergeant Esters, who was walking behind Plaintiff and the two deputies during transport, testified that he saw Plaintiff yelling, making threats, and appearing to pull away from the deputies. Sergeant Esters further testified that he did not see the deputies push or pull Plaintiff's arms.

The LCDC investigator who interviewed Deputy Harris, Deputy Burgess, Plaintiff, and another inmate following this incident did not record that Plaintiff had been physically resisting while being escorted to booking. (Defs. Ex. 203.) Similarly, a disciplinary hearing report issued after the incident contains no indication that Plaintiff had been physically resisting. (Defs. Ex. 199.) Sergeant Esters's own report simply relates that "[w]hile being walked to booking [Plaintiff] made several threats of physical violence toward deputies and supervisors." (Defs. Ex. 129.)

The Court finds both Deputy Harris's and Sergeant Esters's testimony to be credible, and accordingly finds that Plaintiff was jerking around, tensing up, and/or pulling away from Deputy Harris while being transported to booking. Additionally, the Court finds that Deputy Harris exerted upward pressure on Plaintiff's wrist to gain control and to avoid getting into a fight with Plaintiff on the floor. Moreover, the Court finds no inconsistency between these findings and the lack of any indication in the investigative, disciplinary, or inmate behavior reports that Plaintiff was physically resisting. These reports describe Plaintiff as threatening or belligerent during transport,

6

and the omission of any explicit reference to physical resistence is unsurprising in light of the general nature of these reports. (Defs. Ex. 129, 199, 203.)

Conversely, based on Plaintiff's observed demeanor at trial, and his tendency to exaggerate the nature of force used against him as demonstrated most clearly with respect to the November 26, 2005 cell extraction discussed below, the Court discredits Plaintiff's claims that Deputy Harris and the unknown third deputy engaged in a "tug of war" with his arms, or that Sergeant Esters encouraged such behavior by smiling and making verbal comments.[2]

### c. Alleged Excessive Force During Placement in the Booking Cell

Following Plaintiff's transport to booking, he was placed in a booking cell. According to Plaintiff's testimony, Deputy Harris and the unnamed third deputy pushed him to the floor of this cell, causing his left knee, right shoulder and head to hit the cement. Moreover, Deputy Harris allegedly pulled Plaintiff up by his arms, slammed him back to the floor, twisted his legs behind his back, and then jumped on his legs. Finally, Deputy Harris allegedly uncuffed Plaintiff's wrists and excited the cell.

According to Deputy Harris' testimony, he followed established procedure for placing Plaintiff into the booking cell and exiting safely. Specifically, Deputy Harris testified that he ordered Plaintiff to get on his knees and cross his ankles. Deputy Harris then uncuffed Plaintiff's wrists while keeping a foot over Plaintiff's crossed feet to prevent Plaintiff from moving. After the unknown third deputy had exited, Deputy Harris

---

[2] The Court also finds significant that, in a videotape of the November 8, 2005 cell extraction, Plaintiff is observed complaining that LCDC officers are attempting to break his wrists when these officers appear to be exerting little or no pressure upon his wrists. (Defs. Ex. 226.)

released Plaintiff's wrists while stepping backward out of the cell. Deputy Harris denied having struck Plaintiff while in the booking cell.

Sergeant Esters testified similarly, stating that he observed Deputy Harris place Plaintiff into the booking cell, using established procedure. Moreover, Sergeant Esters credibly denied that this procedure, as opposed to the degree of care used in its execution, varies depending upon the level of danger posed by an inmate.

The Court finds both Deputy Harris' and Sergeant Esters' testimony to be credible. Accordingly, the Court finds that Deputy Harris followed established procedure by ordering Plaintiff to his knees, and then uncuffing his wrists while keeping a foot over his crossed feet to prevent him from moving. Moreover, the Court credits both Deputy Harris' and Sergeant Esters' testimony that Deputy Harris did not strike or otherwise assault Plaintiff while placing him in the booking cell.

Conversely, based on Plaintiff's observed demeanor at trial, and his tendency to exaggerate the nature of force exerted against him, the Court discredits Plaintiff's testimony that Deputy Harris pushed him to the floor, pulled him up by his arms, slammed him down to the floor, and jumped on his legs. Finally, in light of Plaintiff's tendency to exaggerate the nature of force used against him, the Court accords little significance to Plaintiff's apparent comment to Deputy Harris, as recorded in the latter's September 6, 2005 report, that Deputy Harris owed Plaintiff "an apology" for his actions. (Defs. Ex. 131.)

### 4. *Plaintiff's Threatening or Derogatory Comments to Defendants*

Following the September 6, 2005 incident, Plaintiff was removed from general population and placed into a segregated housing pod. At various times throughout the next three months, in apparent attempts to provoke Defendants, Plaintiff made threatening or derogatory comments to many of the Defendants.

For instance, in late October, Plaintiff made derogatory racial comments about Deputy Esters, but the latter credibly denied being affected by such comments, relating:

> I don't take an offense when an inmate calls me a name . . . . [I]nmates do this all of the time and it is part of my environment. I think you have to have an expectation you are going to be called names . . . .

(Defs. Ex. 152.) Similarly, in late November 2005, Plaintiff said "[f]uck off, fat boy" and "kiss my ass" to Deputy Rhett Purrier, but the latter credibly denied remembering such comments, testifying:

> I found it a waste of my time to remember those incidents. That was what we were paid to do. We handled inmates on a daily basis. That is part of our job. We get cursed at [and] we get yelled at numerous times. If you can't handle that type of banter and such, then it might be a good idea to move on to another career.

(Defs. Ex. 180.)

Finally, at various times in October 2005, Plaintiff threatened to kill Deputy Jeffrey Armentrout's wife and children, directed general threats against LCDC staff as recorded by Sergeant Jeffrey VanFleet, and made racially derogatory comments about Deputy Santos Romero. (Defs. Ex. 141, 148, 156.) Deputy Armentrout credibly testified that Plaintiff's threats against him were "typical" of those he received from multiple inmates.

**5.    November 8, 2005 to November 11, 2005 Incident**

On November 8, 2005, Plaintiff became agitated by Deputy Burgess' presence in his segregated housing pod.  After Plaintiff threatened Deputy Burgess, Sergeant Esters activated LCDC's Special Emergency Response Team ("SERT") to extract Plaintiff from his cell and transport him to booking.

SERT was headed by Deputy Robert Moll, who, as demonstrated in a videotape of the incident, ordered Plaintiff to put down a broken cup the latter was brandishing as a weapon.  (Defs. Ex. 226.)  Plaintiff ignored Deputy Moll's order.

In an effort to force compliance with his order, Deputy Moll fired seven pepper ball rounds into Plaintiff's cell while ordering Plaintiff to get on the ground.  (Defs. Exs. 118, 226.)  Four of these rounds hit Plaintiff in the upper chest or right arm, and the other rounds missed Plaintiff's body.  (Defs. Ex. 118.)  All of these rounds exploded upon impact, expelling a chemical power that covered parts of Plaintiff's clothes and skin.

After Plaintiff continued to ignore Deputy Moll's orders, SERT entered Plaintiff's cell, restrained Plaintiff, and secured him to a gurney.[3]  (Defs. Ex. 226.)  While wheeling Plaintiff to booking, Deputy Moll asked Plaintiff if he wanted to take a shower.[4]  The videotape shows Plaintiff shouting profanities and kicking his legs during transport, but it

---

[3]   The magistrate judge found, as a matter of law, that SERT did not use excessive force while extracting Plaintiff from his cell (Doc. #  317).  Judge Blackburn approved and adopted this finding.  (Doc. # 326.)

[4]   LCDC policies require officers to decontaminate inmates after deployment of pepper ball rounds by placing them in fresh air "if possible," and by cleaning them with water.  (Defs. Ex. 220.)

does not clearly show Deputy Moll's question, or Plaintiff's response. (Defs. Ex. 226.) Upon examination, Deputy Moll acknowledged that releasing Plaintiff from the gurney to shower during transport would have been impracticable given his aggression. Nonetheless, Deputy Moll also testified that he had hoped his offer would cause Plaintiff to calm down. Deputy Moll acknowledged he could have decontaminated Plaintiff with water against his will while he was restrained in the gurney, or later while he was secured in the emergency restraint chair discussed below.

Upon arrival at booking, SERT members placed a "spit mask" on Plaintiff's face, and then moved him from the gurney into an emergency restraint chair.[5] As defined in LCDC's internal policies, this chair is "[a] mobile padded chair with various restraining straps for the arms, legs, waist, and upper body that is intended to help control a combative, self-destructive, or potentially violent inmate, or when the degree of the inmate's actions exceeds verbal abuse." (Defs. Ex. 218.) The chair secures an inmate at his ankles, wrists, waist, and chest, but allows him to move his head and knees. The arm straps of the chair are similar to seatbelts, but they require a handcuff key to be loosened.

While securing Plaintiff in the chair, unidentified SERT members held Plaintiff's head down. (Defs. Ex. 226.) Deputy Moll and Sergeant Esters assisted in the procedure by securing Plaintiff's legs. (*Id.*) Once Plaintiff's arms and legs were secured, Sergeant Esters used scissors to cut Plaintiff's shirt off in an effort to minimize Plaintiff's exposure to the pepper ball chemicals. (*Id.*) SERT members then secured

---

[5]   A "spit mask" is a terrycloth mask designed to prevent an inmate from spitting at LCDC officers.

Plaintiff's shoulders in the chair. (*Id.*) Once Plaintiff was fully restrained, he no longer presented a threat to LCDC staff, as Sergeant Esters later credibly testified.

Despite having his shirt removed, Plaintiff testified that the chemicals continued to burn on his skin for approximately two to three hours after he was hit by the pepper ball rounds. The Court credits such testimony.

At 2:25 p.m., the SERT members wheeled Plaintiff into the observation cell in booking. (Defs. Ex. 128.) As described in LCDC policies, this cell "is highly visible with glass along the side of the cell to allow continuous and direct supervision of an inmate from the booking deputy's work station." (*Id.*) The cell is approximately four feet wide by eight feet long, and pads on the walls provide little space in the cell for anything other than the emergency restraint chair. Plaintiff credibly testified that he was visible in the emergency restraint chair to any LCDC staff or individuals waiting in the booking lobby.

### a. Alleged Inhumane Conditions of Confinement in the Emergency Restraint Chair

LCDC's internal policies authorize the use of emergency restraint chairs to "control and immobilize inmates who are a threat to the legitimate interests of the detention center." (*Id.*) "Legitimate interests" are defined to include "restoring order, controlling combative or aggressive inmates, protecting inmates against self-inflicted harm[,] and stopping or preventing the destruction of [LCDC] property." (*Id.*)

These policies state that "[u]nder no circumstances will an inmate be placed in the restraint chair for punishment," and mandate that "[t]he inmate's time in the restraint chair shall end when the threat is no longer viable." (*Id.*)

Pursuant to these policies, LCDC nurses are required to check the straps of inmates restrained in emergency restraint chairs every fifteen minutes and to record their observations in a log. (*Id.*) Similarly, LCDC officers are required to provide continuous observation of restrained inmates and to record their observations in a different log. (*Id.*) The policies require that "[a]t least every two hours, the inmate will be allowed to use the toilet facilities, to consume water, and be allowed to stretch and walk for five to ten-minutes." (*Id.*) Such activities must be recorded in the LCDC officers' log. (*Id.*)

According to Plaintiff's testimony, he was restrained in the emergency restraint chair for nineteen hours without food, water, the ability to relieve himself, the ability to wash pepper ball chemicals from his body, or the ability to sleep. With respect to being deprived of food, Plaintiff admits that a sack lunch was placed on Plaintiff's lap at some time the following morning, but asserts that the deputy did not sufficiently loosen his arm strap so that Plaintiff could eat this lunch. Instead, Plaintiff testified that Deputy Meeks allegedly laughed and said, "Oh, looks like you don't want to eat." With respect to water deprivation, Plaintiff testified that LCDC staff never offered Plaintiff water while he was secured in the emergency restraint chair. With respect to being deprived of the ability to relieve himself, Plaintiff testified that he asked to use the bathroom multiple times, but LCDC staff refused his request. As a result, Plaintiff alleges that he was forced to urinate in his pants four times, and defecate in his pants once. With respect to being deprived of the ability to wash, Plaintiff testified that he never had the opportunity to wash the pepper ball chemicals off his skin. With respect to sleep deprivation, Plaintiff testified that the LCDC nurses prevented him from sleeping by wheeling the emergency

restraint chair into the booking lobby every fifteen minutes to check his straps. According to Plaintiff, a trail of urine was allegedly visible to any observers in the booking lobby during such checks.

The nurses' log kept pursuant to LCDC policies recites that Plaintiff was placed in the emergency restraint chair at 2:30 p.m. on November 8, 2005, and was released from the chair at 8:49 a.m. on November 9, 2005.  (Pl. Ex. 33.)  Relevant entries in this log include: (1) Plaintiff's request to urinate at 7:00 p.m.; (2) Plaintiff's verbal threats in response to an offer to be released from the chair at 12:45 a.m.; (3) Plaintiff's spitting of water at 1:30 a.m.; (4) Plaintiff's assertion that he would not cooperate in order to get out of the chair sometime between 3:20 a.m. and 4:50 a.m; and (5) Plaintiff's refusal of food at 7:50 a.m.  (*Id.*)

The log also records that Plaintiff made verbal threats to LCDC nurses and officers throughout nearly the entirety of his time in the chair, and that he either spat at, or attempted to trap nurses' fingers in the straps of his chair, a total of six times between 1:30 a.m. and 3:20 a.m.  (*Id.*)  The log provides no indication that Plaintiff was ever released from the chair, that he ever urinated or defecated, that he was ever cleaned, or that he ever slept.

 The LCDC officers' log kept pursuant to LCDC policies records that Plaintiff was placed in the emergency restraint chair at 2:25 p.m. on November 8, 2005, and was released from the chair at 8:53 a.m. on November 9, 2005.  (Defs. Ex. 128.)  Relevant entries in this log include: (1) Plaintiff's assertion that he needed to urinate at 4:55 p.m.; (2) Plaintiff's threatening of an unidentified officer or nurse when asked if he was ready to come out of the chair at 10:12 p.m.; (3) Plaintiff's swallowing of some water, and

spitting of some water, at 1:23 a.m.; (4) Plaintiff's assertion that he wanted to remain in the chair at 4:12 a.m.; (5) an LCDC officer's advisement that Plaintiff needed to cooperate in order to be released from the chair after he refused food at 7:14 a.m; (6) Plaintiff's assertion that he was being tortured and starved when Deputy Moll asked him if he would cooperate in order to get out of the chair at 7:20 a.m.; (7) Plaintiff's statement of, "go ahead and kill me, mother fucker," when asked if he wanted to eat at 7:44 a.m.; and (8) Plaintiff's refusal to eat after Deputy Meeks placed a sack lunch on his lap, and Deputy Moll loosened his arm strap, at 8:03 a.m.  (*Id.*)

The log also records that Plaintiff made verbal threats to LCDC nurses and officers throughout nearly the entirety of his time in the chair, and that he attempted to spit or bite at nurses or officers, or to pinch nurses' fingers in his straps, a total of four times between 2:10 a.m. and 2:53 a.m.  (*Id.*)  The log provides no indication that Plaintiff was ever released from the chair, that he ever urinated or defecated, that he was ever cleaned, or that he ever slept.

Based on Plaintiff's observed demeanor at trial, and his tendency to exaggerate the nature of LCDC officers' actions against him, the Court generally discredits his testimony regarding his conditions of confinement in the emergency restraint chair, except to the extent that this testimony is corroborated by the nurses' and officers' logs. Conversely, the Court generally credits the representations in these logs as they have not been discredited by any evidence other than Plaintiff's testimony.  Accordingly, with respect to Plaintiff's alleged deprivations, the Court finds as follows:

    (1)    Plaintiff was restrained in the emergency restraint chair from approximately 2:30 p.m. on November 8, 2005 to approximately

9:00 a.m. on November 9, 2005, a period of approximately eighteen and one-half hours.

(2)     Four times between 10:12 p.m. and 7:14 a.m., LDCD officers either explicitly or implicitly offered to release Plaintiff from the chair contingent upon his cooperation.  Plaintiff explicitly or implicitly refused all such offers.

(3)     Plaintiff was offered food three times between 7:14 a.m. and 8:03 a.m, but he refused to eat such food.

(4)     Plaintiff was given water once at approximately 1:23 a.m., but he spat some of this water at LCDC deputies after swallowing some of it.

(5)     Plaintiff communicated his desire to urinate at 4:55 p.m. and at 7:00 p.m., but he was not released from his chair in order to do so.  Plaintiff did not urinate or defecate while secured in the chair.

(6)     Plaintiff was never washed while secured in the chair.

(7)     Plaintiff was prevented from sleeping by the periodic checks of LCDC nurses, but the emergency restraint chair was not regularly wheeled out of the observation cell into the booking lobby.

### b.    *Alleged Inhumane Conditions of Confinement in the Safety Cell*

At approximately 8:40 a.m. on November 9, 2005, Sergeant Esters ordered an LCDC corporal to remove Plaintiff from the emergency restraint chair and to place him into the safety cell in booking.  (Defs. Ex. 121.)  Pursuant to this order, Deputy Meeks and at least two other deputies donned SERT gear, released Plaintiff from the emergency restraint chair, and moved him from the observation cell into the safety cell.  (*Id.*)  As Plaintiff credibly testified, his prolonged restraint in the restraint chair prevented his legs from working properly upon release, and Deputy Meeks had to pick him up and place him into the cell.

As defined in LCDC policies, the safety cell is a "[b]are, padded cell located in booking normally used to confine persons who are either uncontrollably violent or self-destructive." (Defs. Ex. 181.) This cell contained no sink or toilet, although it had a drain in the floor and an elevated step upon which an inmate could lie.

According to Plaintiff's testimony, he was given a blanket in the safety cell, but no mattress. Plaintiff allegedly spent between two and five days in the cell, but could not tell how long because of temporal disorientation.[6] Plaintiff was allegedly given small cups of water once or twice a day in addition to sack lunches. However, due to the lack of a toilet in the cell, Plaintiff testified that he had to urinate in a drain, and defecate into the bags provided with his sack lunches, which were later removed by LCDC staff. Plaintiff was allegedly never allowed to wash while detained in the safety cell.

The LDCD officers' observation log kept pursuant to LCDC policies recites that Plaintiff was placed into the safety cell with a mattress and blanket at 8:53 a.m. on November 9, 2005, and was released from the cell sometime after 5:05 a.m. on November 11, 2005. (Defs. Ex. 128.) Relevant log entries record: (1) Plaintiff's receipt of water at 9:30 a.m. on November 9th; (2) Plaintiff's receipt of meals at 12:09 p.m. and 4:45 p.m. on November 9th;[7] (3) Plaintiff's receipt of meals at 6:39 a.m., 12:21 p.m., and 4:48 p.m. on November 10th; and (4) the removal of "trash" from Plaintiff's cell at 1:17 p.m on November 10th. (*Id.*)

---

[6] The Court notes that Plaintiff was given two shots of an antipsychotic drug while secured in the restraint chair, but the magistrate judge found as a matter of law that this medication did not violate his constitutional rights. (Doc. # 317.) Judge Blackburn approved and adopted this finding. (Doc. # 326.)

[7] As Deputy Moll credibly testified, these meals typically contained a drink.

The log also records that Plaintiff slept most of the time from November 9th to November 11th, but that he also: (1) refused to talk to medical personnel on the afternoons of November 9th and 10th; (2) refused to move back into the segregated housing pod at 4:32 p.m. on November 10th; and (3) threatened, yelled, or directed profanities toward LCDC officers a total of six times between 4:48 p.m. and 10:58 p.m. on November 10th. (*Id.*) The log provides no indication that Plaintiff was ever released from the cell to use a toilet, or that he was ever washed.

Based on Plaintiff's observed demeanor at trial, and his tendency to exaggerate the nature of LCDC officers' actions against him, the Court generally discredits his testimony regarding his conditions of confinement in the safety cell, except to the extent that this testimony is corroborated by, or consistent with, the LCDC officers' log. Conversely, the Court generally credits the representations in this log as they have not been discredited by any evidence other than Plaintiff's testimony. Accordingly, with respect to the conditions of confinement in the safety cell, the Court finds as follows:

(1) Plaintiff was kept in this cell from approximately 9:00 a.m. on November 9, 2005 to approximately 5:00 a.m. on November 11, 2005, a period of approximately forty-four hours.

(2) LCDC officers offered to return Plaintiff to the segregated housing pod at 4:32 on November 10th, but Plaintiff refused.

(3) Plaintiff was provided with food, water or some other drink approximately three times a day while in the safety cell.

(4) Plaintiff was given a mattress and a blanket while in the safety cell.

(5) Plaintiff was not provided with a toilet, and he was not released from the cell in order to use a toilet. As a result, Plaintiff had to urinate into a drain, and to defecate into a bag, which was then removed from his cell at 1:17 p.m. on November 10th.

18

(6)  Plaintiff was not provided with a sink, and he was never washed.

**c.  *Sergeant Esters', Deputy Moll's, and Deputy Meeks' Knowledge of, or Personal Participation in, the Alleged Inhumane Conditions of Confinement***

Based upon their own testimony, which the Court credits, the Court enters the following findings of facts regarding Sergeant Esters's, Deputy Moll's, and Deputy Meek's personal participation in the allegedly inhumane conditions of confinement between November 8, 2005 and November 11, 2005.

*(1)  Sergeant Esters*

On November 8, 2005, Sergeant Esters was in command control of the deputies who extracted Plaintiff from his cell and secured him into the emergency restraint chair. Sergeant Esters' supervisory duties included ensuring that the deputies working under him abided by LCDC policies.

After helping secure Plaintiff to the emergency restraint chair on November 8, 2005, Sergeant Esters left booking at approximately 2:30 p.m.  Nonetheless, he remained aware of Plaintiff's condition based upon the reports of deputies who were continuously observing Plaintiff in the observation cell.  Specifically, Sergeant Esters was advised by these deputies of anything "large . . . important . . . [or] critical" that happened to Plaintiff.

Before Sergeant Esters left LCDC for the evening on November 8, 2005, he advised an LCDC lieutenant of Plaintiff's condition and received from his superior authorization to keep Plaintiff in the emergency restraint chair.  At the time of this advisement — approximately 6:20 p.m. — Sergeant Esters was aware that Plaintiff

had not been released from the emergency restraint chair any time during the preceding four hours.

Sometime after he returned to work at approximately 6:00 a.m. on November 9, 2005, Sergeant Esters was updated on Plaintiff's condition by deputies who had observed Plaintiff over the night. These deputies advised Sergeant Esters that Plaintiff had still not been released from the chair because he continued to pose a threat to LCDC staff.

At 5:24 p.m. on November 9, 2005, based upon Sergeant Esters' briefing of him, an LCDC lieutenant authorized Plaintiff's continued detention in booking "until such time as his behavior is appropriate." (Defs. Ex. 163.)

### (2) *Deputy Moll*

After heading the SERT team that extracted Plaintiff from his cell, Deputy Moll checked on Plaintiff three times during the evening of November 8, 2005, prior to leaving at the end of his shift. All three of these checks occurred between 5:38 p.m. and 5:50 p.m. (Defs. Ex. 128.) Deputy Moll did not know at those times whether Plaintiff had been released from the chair by the other deputies, or whether he had received food or water from these deputies.

After returning to work at approximately 6:00 a.m. on November 9, 2005, Deputy Moll checked on Plaintiff seven times between 6:00 a.m. and 8:14 a.m. (*Id.*) Deputy Moll did not know at those times whether Plaintiff had been released from the restraint chair by the other deputies, or whether he had received food or water from these deputies. Deputy Moll additionally did not remember whether he had read the LCDC officers' log to determine such facts or had only received a general briefing from

other deputies regarding Plaintiff's status after he arrived for work that morning. At 8:03 a.m. on November 9, 2005, Deputy Moll loosened Plaintiff's arm strap so that Plaintiff could eat a sack lunch placed on his lap by Deputy Meeks. Deputy Moll loosened this strap sufficiently that Plaintiff could have removed his arm.

After Plaintiff was moved to the safety cell at approximately 9:00 a.m. on November 9, 2005, Deputy Moll checked on him five times between 1:31 p.m. and 5:30 p.m. Deputy Moll was unaware of Plaintiff's general status during these checks because he had not been advised of this status by the other deputies. After leaving work at approximately 6:00 p.m. on November 9, 2005, Deputy Moll did not return to LCDC at any point during the following two days.

### (3)    *Deputy Meeks*

Deputy Meeks did not work on November 8, 2005. On the morning of November 9, 2005, Deputy Meeks placed a sack lunch on Plaintiff's lap after the latter indicated to him that he was hungry. After helping move Plaintiff to the safety cell at approximately 9:00 a.m. on November 9, 2005, Deputy Meeks did not have any further interaction with Plaintiff while he was in the safety cell.

### d.    **Plaintiff's Alleged Injuries Relating to the November 8, 2005 to November 11, 2005 Incident**

With respect to his alleged injuries relating to the November 8, 2005 to November 11, 2005 incident, Plaintiff testified that unidentified SERT members hurt his back by holding his head down while securing him to the emergency restraint chair. Plaintiff additionally testified that unidentified deputies injured his nose by replacing the "spit mask" on his face with a T-shirt sometime during the night he spent in this chair.

The Court discredits such testimony in light of Plaintiff's observed demeanor at trial.  Moreover, the Court discredits Plaintiff's testimony relating to his alleged back injury because Plaintiff admitted upon examination that he had previously injured his back by lifting cement in 1992 or 1993.  Similarly, the Court discredits Plaintiff's testimony relating to his alleged nose injury because such testimony is inconsistent with contemporary grievances he filed complaining that LCDC deputies had injured his nose by hitting him with a pepper ball round during the November 8, 2005 cell extraction. (Pl. Ex. 43, 44.)

Plaintiff also testified that he suffered anger, fear, humiliation, and other mental and emotional injury from his confinement in the restraint chair.  For instance, with respect to his anger, fear, and humiliation, Plaintiff testified:

> [I felt] [v]ery, very mad and angry, humiliated, scared.  I was scared that this was being done to me.  I was begging to somebody in there that they were letting out to please call the FBI on them or call the Colorado Bureau of Investigation or somebody to get them in here and let — and see what they were doing to me behind closed walls.  I was freaked out for my life being in there.  I never knew they tortured people like this in jail.

With respect to his other alleged mental and emotional injuries, Plaintiff further testified:

> It's just after being in that chair like that, I never knew that human beings in America would treat their own people like this.  It blew my mind and I have even got more hatred for police and I have even asked for psychiatric help after being in this and I can't get it nowhere, but I have thoughts of getting even with them.  I do not drink because I am afraid if I do drink alcohol I may try to do something that I am thinking in my mind and I know I shouldn't be having those thoughts but I don't know how to get rid of them and I need psychological help.

Based on Plaintiff's observed demeanor at trial, the Court credits such testimony, but keeps in mind Plaintiff's tendency to exaggerate.

***6.      November 26, 2005 Incident***

By November 26, 2005, Plaintiff was located back in the segregated housing pod.  Following a shift change, Plaintiff became aggravated when the new deputies on duty denied him thirty minutes of recreation time that another deputy had allegedly promised to him.

According to Sergeant VanFleet's testimony, which the Court credits, the sergeant contacted Plaintiff over an intercom and eventually determined that Plaintiff needed to be transported to booking because he was threatening LCDC staff, creating a disturbance in the housing pod, and attempting to flood his cell.  After Deputy Joseph Pugliese and another deputy were unable to pacify Plaintiff by talking to him, Sergeant VanFleet ordered Deputy Pugliese to assemble SERT to extract Plaintiff from his cell.

While Deputy Pugliese was assembling SERT, Sergeant VanFleet continued speaking with Plaintiff over the intercom.  Although Plaintiff eventually calmed down, he was still directing threats against LCDC staff.  (Defs. Ex. 123.)

As demonstrated in a videotape of the incident, Sergeant VanFleet then contacted Deputy Pugliese on a telephone.  (Defs. Ex. 226.)  Sergeant VanFleet advised Deputy Pugliese that Plaintiff was acting calmer and that he might cooperate with SERT during transport to booking.  Once Deputy Pugliese and SERT arrived in the segregated housing pod, Sergeant VanFleet repeated this information to Deputy Pugliese in person.  (*Id.*)  Specifically, Sergeant VanFleet ordered Deputy Pugliese to again talk to Plaintiff and to walk Plaintiff down to booking if he cooperated.  (*Id.*)

Deputy Pugliese approached the door of Plaintiff's cell and asked him if he would comply with SERT orders.  (*Id.*)  The deputy ordered Plaintiff to kneel on the floor, face

the wall, cross his ankles, and interlace his fingers behind his head.  (*Id.*)  Deputy Pugliese repeated this order three times.  (*Id.*)  Plaintiff ignored these orders and, instead, remained on his bed reading a bible.  (*Id.*)

Deputy Pugliese then led SERT to the door of Plaintiff's cell and repeated his orders two more times.  (*Id.*)  Plaintiff again ignored these orders.  (*Id.*)  Deputy Pugliese thereupon opened the door to Plaintiff's cell and fired thirteen pepper ball rounds at Plaintiff, some of which struck Plaintiff's bible.  (*Id.*)

According to Deputy Pugliese's testimony, which the Court credits, he determined that this number of pepper ball rounds was necessary because Plaintiff could have been concealing a weapon in his bible, or he could have been intending to use this bible as a weapon.  Moreover, Deputy Pugliese credibly testified that he was aware of the November 8, 2005 cell extraction incident described above, and he knew that Deputy Moll's deployment of seven pepper ball rounds during that incident had proven ineffective in gaining Plaintiff's compliance.

Following Deputy Pugliese's deployment of the pepper ball rounds, SERT members placed gas masks over their faces.  (*Id.*)  While they were doing so, Plaintiff shook off his shirt, wiped his face, wrapped his face in a towel, and eventually taunted SERT members to "act like human beings, not animals."  (*Id.*)

Through the cell door, Deputy Pugliese thereupon twice issued the same orders he had previously given to Plaintiff.  (*Id.*)  Plaintiff again ignored these orders.  (*Id.*)  SERT members then entered Plaintiff's cell and extracted him from the cell.  (*Id.*)

According to Plaintiff's testimony, he had been acting "mellow as a marshmallow" prior to the entry of the SERT members and, with the exception of clasping his hands

together in front of his body, he acted like a "rag doll" once the SERT members entered. Moreover, according to Plaintiff, SERT members allegedly stomped on his head while restraining him in the cell, thereby allegedly forcing his ear into a broken pepper ball round and causing his neck and ear to bleed.

Based on Plaintiff's observed demeanor at trial and close scrutiny of the videotape of this extraction,[8] the Court discredits Plaintiff's testimony. Specifically, the Court finds Plaintiff's testimony regarding the SERT members' alleged level of force inconsistent with their observed restraint in lifting Plaintiff from his bed and placing him on the floor of the cell during the extraction. (*Id.*) Moreover, the Court finds Plaintiff's testimony regarding his alleged head injury inconsistent with his actions in vociferously complaining about injury to his leg due to being hit by the pepper balls, but making no such comments with respect to his neck or ear. Further, no blood is visible on his neck or ear in the videotape. (*Id.*) Finally, the Court discredits Plaintiff's testimony that he acted like a "rag doll" during this incident in light of his repeated taunts that SERT members had been "weak," and that they had only been able to pry his hands apart with great difficulty.

Conversely, the Court credits the testimony and reports of Deputy Armentrout, Deputy Aaron Smoyer, and Deputy Candido Martinez regarding their actions in the cell.

Specifically, the Court credits Deputy Armentrout's testimony and report that he restrained Plaintiff's legs upon entering the cell, and that SERT members then lifted

---

[8] The SERT extraction of Plaintiff from his cell was filmed. Although some portions of the extraction cannot be clearly seen on the videotape because Deputy Pugliese was standing in the doorway of the cell, partially obstructing the cameraman's view, the Court was able to observe, at least partially, portions that are relevant to Plaintiff's allegations.

Plaintiff to the floor before securing his extremities.  Moreover, the Court credits Deputy Armentrout's testimony that Plaintiff resisted the attempts of Deputy Candido Martinez and another deputy to secure Plaintiff's arms during this incident.[9]  (Defs. Ex. 123.)

Finally, the Court credits Deputy Martinez's testimony that Plaintiff frustrated SERT members' efforts to secure his arms by clasping his hands together, and that he was spitting at SERT members in the cell.  Moreover, the Court credits Deputy Martinez's and Deputy Armentrout's testimony that SERT members used only as much force as was necessary to pull Plaintiff's clasped hands apart.

Similarly, the Court credits Deputy Aaron Smoyer's testimony that he secured one of Plaintiff's legs and then helped lift Plaintiff to the floor, where SERT members secured his extremities.  Once Plaintiff's extremities were secured, he was placed into a restraint chair and wheeled to booking where he spent approximately two hours in the chair before being moved into a booking cell.  (Defs. Ex. 180, 226.)

### 7.    April 19, 2006 Incident

By April 18, 2006, Plaintiff was located back in general population, due in part to his restored good behavior following the November 26, 2005 incident.  Nonetheless, on that day, Plaintiff became aggravated when a nurse accused him of hoarding an oral rinse for his gums.  After Plaintiff attempted to flood his cell,[10] Deputy Pugliese and another deputy were called to transport Plaintiff to booking.  (Defs. Ex. 125.)

---

[9]   This other deputy appears to be Caesar De Los Santos.  (Defs. Ex. 123.)  Plaintiff appears to have erroneously brought this claim against Deputy Santos Romero (Doc. # 114).

[10]   The Court rejects Plaintiff's testimony that he was actually just flushing an inordinate amount of toilet paper down his toilet because this paper had accidentally rolled off the roll, and flushing it down the toilet was easier than rolling it back up.

According to Plaintiff's testimony, Deputy Pugliese arrived in his cell and struck him on the head with his handcuffs prior to transport. Based on Plaintiff's observed demeanor at trial and his tendency to exaggerate the level of force used against him, the Court discredits such testimony. Instead, the Court credits Deputy Pugliese's testimony that he handcuffed Plaintiff properly according to the standing modified handcuffing technique and that he did not strike Plaintiff on the head.

Once Plaintiff was handcuffed, he was escorted to booking without incident. Upon arrival in booking, Plaintiff was placed into a booking cell, which he credibly described as containing a bench, a toilet, and a half-wall providing privacy for the toilet. At approximately 3:50 a.m. on April 19, 2006, Plaintiff was sitting with his feet on the bench and his knees under his T-shirt. Plaintiff was blowing air into the neck hole of his T-shirt in an attempt to stay warm.[11]

According to both Deputy Pugliese's testimony and report, both of which the Court credits, Plaintiff had torn the neck of his T-shirt by stretching the shirt over his knees. (Defs. Ex. 124.) Moreover, pursuant to both Deputy Purrier's and Deputy Armentrout's testimony, both of which the Court also credits, torn clothes posed a potential threat to Plaintiff's safety. Specifically, both Deputy Purrier and Deputy Armentrout credibly testified that they had either personally witnessed, or personally prevented, inmates' attempts to commit suicide with their own clothes.

---

[11]   The magistrate judge found, as a matter of law, that the alleged temperature in this cell — purportedly fifty degrees — did not constitute an unconstitutional condition of confinement (Doc. # 317). Judge Blackburn approved and accepted this recommendation (Doc. # 326).

According to Corporal Harteker's testimony, which the Court credits, Deputy Pugliese informed the corporal of Plaintiff's torn T-shirt. The corporal then ordered Plaintiff to relinquish the T-shirt out of concern for Plaintiff's safety.

In response to Corporal Harteker's order, Plaintiff removed the T-shirt and placed it on the floor of his cell. Before Corporal Harteker could retrieve the T-shirt, Plaintiff picked it up and placed it on the half-wall in the cell. Plaintiff subsequently placed the T-shirt back on his body in some fashion, and testified that he had ripped it in defiance of LCDC authority by that point.

According to Plaintiff's testimony, various defendants thereupon entered his cell and assaulted him. Specifically, these defendants allegedly slammed Plaintiff to the floor, attempted to break his arm, shocked him with a taser, and jumped on his legs after placing him in a "figure four" position on the floor. In addition, Deputy Romero allegedly stuck his finger into Plaintiff's mouth, and Plaintiff was allegedly knocked unconscious twice during the struggle.

Based on Plaintiff's observed demeanor at trial, lack of physical injury, and tendency to exaggerate the nature of force used against him, the Court discredits this testimony. Instead, the Court credits the testimony and reports of the various deputies who entered the cell in response to Corporal Harketer's order.

Specifically, the Court credits Deputy Armentrout's and Romero's testimony and reports that they entered Plaintiff's cell under Corporal Harteker's order to retrieve Plaintiff's T-shirt, and that each struggled with Plaintiff in an attempt to secure his arms. (Defs. Ex. 124.) Moreover, the Court credits Deputy Romero's testimony that Plaintiff: (1) attempted to scratch Deputy Romero's face and chest during this struggle; (2) was

never knocked unconscious during the struggle; (3) kicked Deputy McHugh during the struggle; and (4) bit Deputy Romero's finger during this struggle.

Similarly, the Court credits Deputy McHugh's testimony and report that Corporal Harteker ordered her to retrieve Plaintiff's T-shirt after Deputies Armentrout and Romero had secured Plaintiff's arms, but that Plaintiff kicked her twice in the torso while she attempted to do so. (*Id.*)  The Court further credits her testimony that: (1) Deputy Purrier entered the cell only after Plaintiff began kicking her; and (2) Deputy Pugliese deployed his taser only after Deputy Romero yelled that Plaintiff was biting him. Additionally, the Court credits Deputy McHugh's testimony that the deputies eventually retrieved Plaintiff's T-shirt, and that Deputy Pugliese then exited the cell after placing Plaintiff face down on the cell floor to prevent him from swinging back upon the exiting deputies.

The Court also credits Deputy Purrier's testimony and report that he: (1) helped secure Plaintiff's legs; (2) observed Plaintiff resisting the various deputies; and (3) heard Deputy Romero yelling that Plaintiff was biting him. (*Id.*)

Finally, the Court credits Deputy Pugliese's testimony and report that he shocked Plaintiff with a taser after Deputy Romero yelled that Plaintiff was biting his finger, and that he subsequently exited the cell after placing Plaintiff in a prone position on the floor. (*Id.*)  The Court credits Deputy Pugliese's testimony that Plaintiff never stopped fighting from the time the deputies had entered his cell until the time they exited.

**CONCLUSIONS OF LAW**

*1.*     *Overview*

Plaintiff brings three excessive force claims based on the September 6, 2005, November 26, 2005 and April 19, 2006 incidents described above.  Plaintiff brings one conditions of confinement claim based upon the November 8, 2005 to November 11, 2005 incident described above.  Each of these claims is brought under 42 U.S.C. § 1983, which provides a remedy for constitutional violations committed by individuals acting under color of state law.  *See* 42 U.S.C. § 1983 (2006).

After outlining the law applicable to each of these claims, the Court enters its conclusions of law pertaining to each claim in turn.  At the outset, the Court notes that Eighth Amendment standards apply to each of Plaintiff's claims irrespective of whether Plaintiff was a pretrial detainee, or a convicted prisoner, at the time of the alleged incidents.[12]  *See, e.g.*, *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) ("Although the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, the Eighth Amendment standard provides the benchmark for such claims.'); *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999) (pretrial detainees are protected under the due process clause, but courts "apply an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983").

---

[12]   As indicated above, neither party adduced competent evidence establishing when Plaintiff pled guilty to his various criminal charges.  The closest such evidence was Plaintiff's testimony that he was only "convicted" of these charges in 2006, but the Court discredits such testimony in light of Plaintiff's unreliable memory and lack of legal training.

### a. Excessive Force Claims Under the Eighth Amendment

The "core inquiry" for an Eighth Amendment excessive force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1152 (10th Cir. 2006) (citing *Whitley v. Albers*, 475 U.S. 312, 319 [1986]).

The Tenth Circuit has articulated two "prongs" that a plaintiff must prove to prevail on an excessive force claim: (1) that "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation;" and (2) "that the officials acted with a sufficiently culpable state of mind." *Id.* (citing *Smith v. Cochran*, 339 F.3d 1205, 1212 [10th Cir. 2003]).

With respect to the first prong, "the objective component of an excessive force claim is 'contextual and responsive to contemporary standards of decency.'" *Smith*, 339 F.3d at 1212 (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 [1992]).

With respect to the second prong, the Tenth Circuit holds that a sufficiently culpable state of mind may be inferred "where 'there can be no legitimate purpose for the officers' conduct.'" *Serna*, 455 F.3d at 1152 (quoting *Smith*, 339 F.3d at 1213).

Moreover, under Supreme Court jurisprudence, the legitimacy of the use of force may be assessed in reference to: (1) the need to use force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the officers; and (4) any effort to temper the severity of the forceful response. *Hudson*, 503 U.S. at 7; *see also, e.g.*, *Rhoten v. Werholtz*, 243 F. App'x 364, 366 (10th Cir. 2007).

While the extent of an inmate's injury is relevant to an excessive force claim, the inmate need not prove any certain level or type of injury to prevail on his claim.

*Hudson*, 503 U.S. at 7, 9; *United States v. LaVallee*, 439 F.3d 670, 680 (10th. Cir. 2006).

> **b.** **Conditions of Confinement Claims Under the Eighth Amendment**

To prevail on an Eighth Amendment conditions of confinement claim, an inmate must establish: (1) that the condition complained of is "sufficiently serious" to implicate constitutional protection; and (2) prison officials acted with "deliberate indifference to inmate health or safety." *Reynolds v. Powell*, 370 F.3d 1028, 1031 (10th Cir. 2004) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 [1994]).

With respect to the first prong, the inmate must show that the condition complained of constituted a "condition posing a substantial risk of serious harm" to inmate health or safety. *Id.* (quoting *Farmer*, 511 U.S. at 834). In assessing whether this standard is met, the Court must conduct a contextual analysis of the "circumstances, nature, and duration" of the challenged condition. *DeSpain*, 264 F.3d at 974.

With respect to the second prong, a plaintiff proves a defendant's "deliberate indifference" by showing "both knowledge and disregard of possible risks, a *mens rea* on a par with criminal recklessness." *DeSpain*, 264 F.3d at 975 (citing *Farmer*, 511 U.S. at 836). Whether or not a defendant had a sufficiently culpable state of mind is a question of fact, and a defendant's state of mind may be inferred from circumstantial evidence, including the fact that the risk to an inmate's health or safety was obvious. *Id.* (citing *Farmer*, 511 U.S. at 842).

**2.** *September 6, 2005 Incident (Claim III)*

Plaintiff's first excessive force claim is asserted against Sergeant Esters and Deputy Harris in relation to the September 6, 2005 incident described above. For the following reasons, the Court finds that Plaintiff has failed to prove the elements of this claim by a preponderance of the evidence.

First, with respect to the objective prong of an excessive force inquiry, the Court finds that Sergeant Esters' and Deputy Harris' alleged wrongdoing was not objectively harmful enough to establish a constitutional violation. *Serna*, 455 F.3d at 1152.

Specifically, as found above, the only force either Sergeant Esters or Deputy Harris used during the September 6, 2005 incident was: (1) Deputy Harris' use of two arms to pull down Plaintiff's left arm to handcuff him (and any force attendant to Deputy Harris' handcuffing of Plaintiff according to a standard technique); (2) Deputy Harris' exertion of upward pressure on Plaintiff's wrist while transporting Plaintiff to booking; and (3) Deputy Harris' pressure on Plaintiff's crossed ankles in the booking cell. The Court finds as a matter of law that such force does not offend contemporary standards of decency. *Smith*, 339 F.3d at 1212; *Rhoten*, 243 F. App'x at 367 (finding, as a matter of law, that allegations that officers slammed an inmate against a wall, squeezed his nipples and buttocks, and pulled his testicles did not satisfy objective prong of an excessive force claim).

Alternatively, even assuming that such force is objectively wrongful enough to establish a constitutional violation, the Court finds that neither Sergeant Esters nor Deputy Harris acted with a sufficiently culpable state of mind in order to incur liability for the September 6, 2005 incident. *Serna*, 455 F.3d at 1152.

Specifically, because Plaintiff has adduced no direct evidence of Sergeant Esters' or Deputy Harris' mental states during this incident, their malicious and sadistic intent must be inferred, if at all, through circumstance evidence, such as the absence of a legitimate purpose for their conduct. *Serna*, 455 F.3d at 1152. Moreover, the legitimacy of their use of force may be assessed with reference to: (1) the need to use force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the officers; and (4) any effort to temper the severity of the forceful response. *Hudson*, 503 U.S. at 7.

In consideration of these factors, the Court finds that Sergeant Esters' and Deputy Harris' use of force was legitimate, and hence, that Sergeant Esters and Deputy Harris did not act maliciously or sadistically in the absence of any other compelling evidence probative of their mental states. With respect to Deputy Harris' use of two arms to pull down Plaintiff's left arm in order to handcuff him (and any force attendant to Deputy Harris' handcuffing of Plaintiff according to the standard technique), the Court finds such force legitimate under the four *Hudson* factors. Specifically, the Court finds that: (1) such force was needed to safely transport Plaintiff to booking; (2) Deputy Harris only used so much force as was necessary to properly handcuff Plaintiff; (3) Deputy Harris reasonably perceived that Plaintiff was resisting being handcuffed; and (4) Deputy Harris only used two arms to pull down Plaintiff's left arm after the normal standing modified handcuffing technique had failed.[13]

---

[13] As Sergeant Esters demonstrated for the Court, this technique requires an officer to use only one arm to pull down an inmate's left arm; the officer's other arm is kept on the inmate's right wrist which remains on the back of the inmate's head until the inmate's left arm is secured behind his back.

With respect to Deputy Harris' exertion of upward pressure on Plaintiff's wrist during transport to booking, the Court finds such force legitimate. Specifically, the Court finds that: (1) such force was needed to prevent Plaintiff from jerking around, tensing up, or pulling away from Deputy Harris; (2) such force was proportionate to Plaintiff's actions; (3) Deputy Harris reasonably perceived that Plaintiff's resistence could have led to a fight with Plaintiff on the floor if he had not counteracted such actions; and (4) Deputy Harris only applied this force to Plaintiff's wrist after Plaintiff started resisting him.

With respect to Deputy Harris' application of pressure on Plaintiff's crossed ankles in the booking cell, the Court also finds such force legitimate. Specifically, the Court finds that: (1) such force was needed to prevent Plaintiff from swinging around upon the deputies as they exited the cell; (2) such force was proportionate to this need; (3) Deputy Harris reasonably perceived that Plaintiff might have fought the deputies absent use of this technique; and (4) Deputy Harris did not alter the standard cell-exiting technique despite the heightened danger posed by Plaintiff.

Finally, to whatever extent Sergeant Esters might allegedly be liable upon a supervisory liability theory for the aggregate level of force used during the September 6, 2005 incident, the Court finds that this aggregate level of force was legitimate under the four *Hudson* factors. Specifically, the Court finds that: (1) Plaintiff needed to be transported to booking based upon his interaction with Deputy Burgess; (2) Sergeant Esters' deployment of Deputy Harris and the third unknown deputy to facilitate this transport was reasonable in light of Deputy Burgess' report to the sergeant; (3) Sergeant Esters reasonably perceived that Plaintiff posed a threat to LCDC staff

35

based upon his resistence during handcuffing and his intransigence during transport; and (4) in response to Plaintiff's actions, Deputy Harris used appropriate levels of force during both the handcuffing and transport.

Based on the foregoing, the Court finds that Sergeant Esters' and Deputy Harris' use of force was legitimate during the September 6, 2005 incident, and hence, was used in a good-faith effort to maintain or restore discipline, rather than maliciously and sadistically to cause harm. *Serna*, 455 F.3d at 1152.

### 3.     *November 26, 2005 Incident (Claim V)*

Plaintiff's second excessive force claim is asserted against Sergeant VanFleet, Deputy Pugliese, Deputy Martinez, Deputy Armentrout, and Deputy Smoyer in relation to the November 26, 2005 incident described above.  For the following reasons, the Court finds that Plaintiff has failed to prove the elements of this claim by a preponderance of the evidence.

First, with respect to the objective prong of an excessive force inquiry, the Court finds that Deputy Pugliese's deployment of thirteen pepper ball rounds into Plaintiff's cell was objectively harmful enough to establish a constitutional violation.  *Serna*, 455 F.3d at 1152.  Such force, at least viewed in a vacuum, offends contemporary standards of decency.  *Smith*, 339 F.3d at 1212; *Hunter v. Young*, 238 F. App'x 336 at *2 (10th Cir. 2007) (affirming a summary judgment dismissal of an excessive force claim relating to a taser deployment only *after* analyzing the conditions confronting the defendant officer).

Conversely, the Court finds that neither (1) Deputies Armentrout's and Smoyer's force in securing Plaintiff's legs and lifting him to the floor, nor (2) Deputy Martinez's force in pulling Plaintiff's clasped hands apart, were objectively harmful enough to

establish a constitutional violation. *Serna*, 455 F.3d at 1152. Such force, as a matter of law, does not offend contemporary standards of decency. *Smith*, 339 F.3d at 1212; *Rhoten*, 243 F. App'x at 367.

Alternatively, even assuming that Deputies Armentrout's, Smoyer's, and Martinez's force was objectively wrongful enough to establish a constitutional violation, the Court finds that none of these deputies — nor Deputy Pugliese, nor Sergeant VanFleet — acted with a sufficiently culpable state of mind in order to incur liability for the November 26, 2005 incident. *Serna*, 455 F.3d at 1152.

Specifically, because Plaintiff has adduced no direct evidence of any of these Defendants' mental states during this incident, their malicious and sadistic intent must be inferred, if at all, through circumstantial evidence, such as the absence of a legitimate purpose for their conduct. *Serna*, 455 F.3d at 1152. Moreover, the legitimacy of their use of force must be assessed with reference to the four *Hudson* factors cited above.

In consideration of these factors, the Court finds for the following reasons that each of these Defendants' use of force was legitimate, and hence, that none of these Defendants acted maliciously or sadistically.

With respect to Deputy Pugliese's deployment of thirteen pepper ball rounds into Plaintiff's cell, the Court finds such force legitimate under the four *Hudson* factors. Specifically, the Court finds that: (1) such force was needed to gain Plaintiff's compliance with the deputy's orders; (2) such force was proportionate to this need in light of Deputy Moll's earlier inability to gain compliance with his orders through

deployment of seven pepper ball rounds;[14] (3) Deputy Pugliese reasonably perceived that Plaintiff could have been concealing a weapon in his bible, or could have been intending to use this bible as a weapon; and (4) Deputy Pugliese deployed the pepper ball rounds only after Plaintiff refused five times to obey Deputy Pugliese's order to assume a safe position in the cell.

With respect to (1) Deputies Armentrout's and Smoyer's use of force in securing Plaintiff legs and lifting him to the ground, and (2) Deputy Martinez's force in pulling Plaintiff's clasped hands apart, the Court finds such force legitimate. Specifically, the Court finds that: (1) such force was needed to safely secure Plaintiff prior to transport; (2) such force was proportionate to this need; (3) Deputies Armentrout, Smoyer, and Martinez reasonably perceived that failure to secure Plaintiff's extremities could have exposed them, or Plaintiff, to injury during transport; and (4) Deputies Armentrout, Smoyer, and Martinez only used such force after Deputy Pugliese's efforts to facilitate a less antagonistic transport to booking had failed.

Finally, to whatever extent Sergeant VanFleet might allegedly be liable upon a supervisory liability theory for the aggregate level of force used on November 26, 2005, the Court finds that this aggregate level of force was legitimate under the four *Hudson* factors. Specifically, the Court finds that: (1) Plaintiff needed to be transported to booking due to his threats to staff, attempts to flood his cell, and disruption to other inmates; (2) Sergeant VanFleet's deployment of SERT to extract Plaintiff from his cell was reasonable in light of Plaintiff's known propensity for violence; (3) Sergeant

---

[14]   The Court also finds it significant that, even after deployment of thirteen pepper ball rounds, Plaintiff acted unfazed and continued to ignore Deputy Pugliese's orders.

VanFleet reasonably perceived that Plaintiff might fight SERT members based on the latter's statements to him over the intercom; and (4) Sergeant VanFleet used appropriate levels of force by ordering Deputy Pugliese to first talk to Plaintiff to see if voluntary compliance could be obtained, approving a relatively pacific transport to booking if Plaintiff complied with Deputy Pugliese's orders, and sanctioning the cell extraction only if Plaintiff continued ignoring Deputy Pugliese's orders.

Based on the foregoing, the Court finds that Deputies Pugliese's, Armentrout's, Smoyer's, Martinez', and Sergeant VanFleet's use of force was legitimate during the November 26, 2005 incident. Such use of force was exercised in a good-faith effort to maintain or restore discipline, rather than maliciously and sadistically to cause harm. *Serna*, 455 F.3d at 1152.

### 3. April 19, 2006 Incident (Claim VI)

Plaintiff's third excessive force claim is asserted against Corporal Harteker, Deputy Pugliese, Deputy McHugh, Deputy Purrier, Deputy Romero, and Deputy Armentrout in relation to the April 19, 2006 incident described above. For the following reasons, the Court finds that Plaintiff has failed to prove the elements of this claim by a preponderance of the evidence.

First, with respect to the objective prong of an excessive force inquiry, the Court finds that Deputy Pugliese's deployment of the taser was objectively harmful enough to establish a constitutional violation. *Serna*, 455 F.3d at 1152. Such force, at least viewed in a vacuum, offends contemporary standards of decency. *Smith*, 339 F.3d at 1212; *Hunter*, 238 F. App'x at *2.

Conversely, the Court finds that (1) Deputies Armentrout's and Romero's force in securing Plaintiff's arms during the struggle, (2) Deputies Purrier's and McHugh's force in securing Plaintiff's legs during the struggle, and (3) Deputy Pugliese's placement of Plaintiff in a prone position prior to exiting the cell, were not objectively harmful enough to establish a constitutional violation. *Serna*, 455 F.3d at 1152. Such force, as a matter of law, does not offend contemporary standards of decency. *Smith*, 339 F.3d at 1212; *Rhoten*, 243 F. App'x at 367. Alternatively, even assuming that such use of force was objectively wrongful enough to establish a constitutional violation, the Court finds that none of these deputies — nor Corporal Harteker — acted with a sufficiently culpable state of mind to incur liability for the April 19, 2006 incident. *Serna*, 455 F.3d at 1152.

Specifically, because Plaintiff has adduced no direct evidence of any of these defendants' mental states during the incident, their malicious and sadistic intent must be inferred, if at all, through circumstantial evidence, such as the absence of a legitimate purpose for their conduct. *Serna*, 455 F.3d at 1152. Moreover, the legitimacy of their use of force must be assessed with reference to the four *Hudson* factors. In consideration of these factors, the Court finds for the following reasons that all of these Defendants' use of force was legitimate, and hence, that none of these Defendants acted maliciously or sadistically.

With respect to Deputy Pugliese's use of a taser, the Court finds such force legitimate under the four *Hudson* factors. Specifically, the Court finds that: (1) such force was needed to stop Plaintiff from biting Deputy Romero's finger; (2) such force was proportionate to this need; (3) Deputy Pugliese reasonably perceived that Plaintiff was endangering Deputy Romero; and (4) Deputy Pugliese used such force only after

becoming aware of this danger. Similarly, with respect to Deputy Pugliese's manipulation of Plaintiff into a prone position prior to exiting the cell, the Court finds such force legitimate for substantially the same reasons cited above with respect to Deputy Harris' use of a similar technique in exiting the booking cell on September 6, 2005.

With respect to (1) Deputies Armentrout's and Romero's force in securing Plaintiff's arms during the struggle, and (2) Deputies Purrier's and McHugh's force in securing Plaintiff's legs during the struggle, the Court finds such force legitimate. Specifically, the Court finds that: (1) Plaintiff's arms needed to be secured so that Deputy McHugh could recover Plaintiff's T-shirt, and Plaintiff's legs needed to be secured for the deputies' safety after Plaintiff kicked Deputy McHugh; (2) Deputies Armentrout's, Romero's, Purrier's and McHugh's force was proportionate to these needs; (3) these deputies reasonably perceived that Plaintiff was dangerous based upon his biting of Deputy Romero and his kicking of Deputy McHugh; and (4) Deputies Armentrout and Romero only secured Plaintiff's arms so that Deputy McHugh could recover Plaintiff's T-shirt, and Deputies Purrier and McHugh only secured Plaintiff's legs after Plaintiff kicked Deputy McHugh.

Finally, to whatever extent Corporal Harteker might allegedly be liable upon a supervisory liability theory for the aggregate level of force used on April 19, 2006, the Court finds that this aggregate level of force was legitimate under the four *Hudson* factors. Specifically, the Court finds that: (1) Plaintiff's T-shirt needed to be retrieved in light of the potential risk this shirt posed to Plaintiff's safety; (2) Corporal Harteker's deployment of five deputies to retrieve this shirt was reasonable given Plaintiff's known

propensity for violence; (3) Corporal Harteker reasonably perceived that Plaintiff might be dangerous based upon his intransigence in relinquishing the T-shirt; and (4) at least to the extent that he actively managed the melee, Corporal Harteker used appropriate levels of force by first sending Deputies Armentrout, Romero, and McHugh to retrieve Plaintiff's T-shirt, then sending Deputy Purrier to assist Deputy McHugh, and finally sending Deputy Pugliese to assist Deputy Romero.

### 4. November 8, 2005 to November 11, 2005 Incident (Claim IV)

Plaintiff's conditions of confinement claim is asserted against Sergeant Esters, Deputy Moll, and Deputy Meeks in relation to the November 8, 2005 to November 11, 2005 incident described above. For the following reasons, the Court finds that Plaintiff has proven both elements of this claim by a preponderance of the evidence with respect to Sergeant Esters, but not with respect Deputy Moll or Deputy Meeks.

At the outset, the Court notes that the Eighth Amendment's "deliberate indifference" standard properly controls this claim because, as found above, Plaintiff presented no further danger to LCDC staff while he was secured in the emergency restraint chair.[15] *See DeSpain*, 264 F.3d at 976 (holding that the Eighth Amendment's "deliberate indifference" standard replaces its "malicious and sadistic" standard with respect to conditions of confinement imposed in the wake of a prison disturbance "as soon as inmates are secure and present 'no further danger to prison staff, the public, or each other'" [citation omitted]).

---

[15] Conversely, had Plaintiff ever been released from this chair — or had he ever been released from the safety cell — the Eighth Amendment's "malicious and sadistic" standard would have governed LCDC officers' use of force in controlling him during such periods.

### a. Unconstitutional Conditions of Confinement in the Emergency Restraint Chair and the Safety Cell

First, with respect to the objective prong of a conditions of confinement claim, the Court finds for the following reasons that Plaintiff's deprivations while secured in the restraint chair and safety cell were "sufficiently serious" to implicate constitutional protection. *Reynolds*, 370 F.3d at 1031.

#### (1) Emergency Restraint Chair

As found above, Plaintiff spent approximately eighteen and a half hours in the emergency restraint chair without the ability to: (1) stretch or significantly move; (2) use a toilet; or (3) sleep. Moreover, Plaintiff spent approximately eleven of these hours without access to water, and approximately sixteen and one half of these hours without access to food. Finally, Plaintiff spent the entirety of this time without being decontaminated of the pepper ball chemicals on his skin.[16]

The Court finds that, in light of the nature, circumstances, and duration of Plaintiff's restraint in the emergency restraint chair, these deprivations — either independently, or in combination — posed a substantial risk of serious harm to his health or safety. *Reynolds*, 370 F.3d at 1031; *DeSpain*, 264 F.3d at 974.

Specifically, the Court finds that, independent of the other deprivations, Plaintiff's inability to stretch or significantly move for approximately eighteen and one half hours posed a substantial risk of serious harm to his health, as demonstrated most clearly by

---

[16] The Court rejects Defendants' argument that Plaintiff "chose" to be deprived of such facilities through his non-cooperation with LCDC staff. As demonstrated below, this argument improperly presupposes that an inmate may be deprived of basic life necessities — regardless of any actualized threat he poses — in deterrence of his intransigent behavior.

his inability to properly move upon release from the chair. Similarly, the Court finds that, also independent of the other deprivations, Plaintiff's inability to use a toilet during this same period posed a substantial risk of serious harm to his health irrespective of whether he consequently urinated or defecated in his pants.[17]

Moreover, the Court finds that, in combination, the burning of pepper ball chemicals on Plaintiff's skin for two or three hours, Plaintiff's deprivation of sleep throughout the night, Plaintiff's deprivation of water until 1:23 a.m., and Plaintiff's deprivation of food until 7:14 a.m., posed a substantial risk of serious harm to his health. *See*, *e.g.*, *Bainum v. Sedgwick County Comm'rs*, 27 F. App'x 965, 970 (10th Cir. 2001) (stating that when "a claim involves a number of inhumane confinement conditions" courts should consider both the severity and duration of the deprivations, which are generally inversely proportional).

Moreover, the Court rejects any suggestion that these conditions of confinement were justified by the "circumstances" of Plaintiff's detention. *DeSpain*, 264 F.3d at 974. Defendants' argument, as articulated most cogently by Sergeant Esters upon examination, appears to be that LCDC officers could restrain Plaintiff in the emergency restraint chair so long as he posed a threat to such officers upon his release. The vicious corollary to such logic is that, so long as Plaintiff remained uncooperative in this chair, he could be deprived of such basic life necessities as the ability to move, the ability to use a toilet, the ability to sleep, and, to a lesser extent, access to food and water.

---

[17] As found above, Plaintiff at a minimum communicated his desire to urinate to LCDC staff twice during the evening of November 8, 2005.

The Court finds such a suggestion untenable, and accordingly holds that the mere "circumstance" of needing to prevent Plaintiff from endangering LCDC staff upon his release from the chair does not absolve LCDC staff from providing him with humane conditions of confinement while he remained in the chair.[18]

### (2) Safety Cell

As also found above, Plaintiff spent approximately forty-four hours in the safety cell without: (1) access to a toilet; or (2) the ability to wash himself. The Court finds that, in light of the nature, circumstances, and duration of Plaintiff's detention in the safety cell, these deprivation also posed a substantial risk of serious harm to Plaintiff's health or safety. *Reynolds*, 370 F.3d at 1031; *DeSpain*, 264 F.3d at 974.

Specifically, the Court finds that, in combination, the deprivation of a toilet for forty-four hours and the deprivation of a sink for forty-four hours (especially following a similar deprivation for eighteen and one half hours in the restraint chair), and sleeping in close proximity to Plaintiff's own feces, even if the feces were contained in a bag, for an indeterminate period of time, posed a substantial risk of serious harm to Plaintiff's health. *See, e.g.*, *McBride v. Deer*, 240 F.3d 1287, 1291–92 (10th Cir. 2001) (observing that "human waste has been considered particularly offensive so that 'courts have been especially cautious about condoning conditions that include an inmate's proximity to it,'"

---

[18] The Court notes that LCDC's own policies already reflect this understanding by mandating that "[a]t least every two hours, the inmate will be allowed to use the toilet facilities, to consume water and be allowed to stretch and walk for five to ten-minutes." (Defs. Ex. 218.) Moreover, these policies recite that LCDC deputies will receive yearly training on "how to handle agitated inmates who have to be released from their restraints in order to use the toilet or to stretch to ensure proper circulation." (*Id.*)

and finding that an inmate had stated a claim for relief by alleging that he had been forced to live in proximity to feces for three days [further citation omitted]).

Moreover, the Court rejects any suggestion that these conditions of confinement were justified by the "circumstances" of Plaintiff's detention. *DeSpain*, 264 F.3d at 974. No credible evidence was submitted demonstrating that Plaintiff could not have been safely removed from the restraint chair and placed in the safety cell, as was eventually done, albeit seventeen hours too late. Similarly, based on the testimony and the exhibits, particularly the log sheets, it was apparent that, after spending eighteen hours in the restraint chair, Plaintiff had worn himself out and slept during most of his confinement in the safety cell. No explanation was provided regarding why Plaintiff remained confined in a safety cell, rather than being moved to a regular cell containing water and toilet facilities. Defendants have advanced no argument that they needed to deprive Plaintiff of a sink or toilet for any reason (much less for a total of sixty two and one half hours), and the Court accordingly finds that the "circumstances" of these deprivations do not exempt these deprivations from constitutional infirmity.

>    ### b.    *Deliberate Indifference to Inmate Health or Safety, and Personal Participation*

Having found that Plaintiff's conditions of confinement in the emergency restraint chair and safety cell were "sufficiently serious" to satisfy the objective prong of Plaintiff's conditions of confinement claim, the Court turns to whether Sergeant Esters, Deputy Moll, or Deputy Meeks personally participated in the provision of these conditions and had sufficiently culpable states of mind to incur liability.

*(1)      Sergeant Esters*

As found above, Sergeant Esters was in command control of the deputies who secured Plaintiff in the emergency restraint chair and who later moved him to the safety cell.  Moreover, Sergeant Esters' supervisory duties included ensuring that the deputies working under him abided by LCDC policies.

Throughout the afternoon of November 8, 2005, Sergeant Esters remained aware of Plaintiff's condition based upon the reports of deputies who were continuously observing him.  By 6:20 p.m., when Sergeant Esters received continuing authorization from an LCDC lieutenant to keep Plaintiff in the emergency restraint chair, he was aware that Plaintiff had not been released from this chair any time during the preceding four hours.

Sometime after returning to work at approximately 6:00 a.m. on November 9, 2005, Sergeant Esters was updated on Plaintiff's condition by the deputies who had observed him over the night, and he was told that Plaintiff had still not been released from the chair.

Finally, by the evening of November 9, 2005, based upon Sergeant Esters' briefing, an LCDC lieutenant approved Plaintiff's continued detention in booking "until such time as his behavior is appropriate."

Based on the foregoing, the Court finds that Sergeant Esters personally participated in the provision of the unconstitutional conditions of confinement in both the emergency restraint chair and the safety cell.  *See, e.g.*, *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (reciting that a supervisor may be personally liable on a section 1983 claim "where 'an affirmative link' exists between the constitutional

deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise" [further internal citations and quotation marks omitted]).

Likewise, the Court finds that Sergeant Esters acted with deliberate indifference in the provision of such conditions because the risk to Plaintiff's health was obvious, and the Court infers from the obviousness of this risk that Sergeant Esters knew of, and disregarded, the possible risks posed to Plaintiff's health.  *DeSpain*, 264 F.3d at 975.

> (2)  <u>Deputy Moll</u>

As also found above, Deputy Moll checked on Plaintiff three times in the emergency restraint chair between 5:38 p.m. and 5:50 p.m. on November 8, 2005, but did not know at those times whether Plaintiff had been released from the chair by the other deputies, or whether he had received food or water from these deputies.

Similarly, Deputy Moll checked on Plaintiff seven times between 6:00 a.m. and 8:14 a.m. on November 9, 2005, but did not know whether Plaintiff had been released from the chair by the other deputies, or whether he had received food or water from these deputies.

Finally, Deputy Moll checked on Plaintiff five times in the safety cell between 1:31 p.m. and 5:30 p.m. on November 9, 2005, but was unaware of Plaintiff's general status during these checks because he had not been advised of this status by the other deputies.

Based on the foregoing, the Court finds that Deputy Moll personally participated in the provision of the unconstitutional conditions of confinement in both the emergency restraint chair and the safety cell by failing to redress these conditions during his various

48

checks. *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996) ("personal participation is an essential allegation in a § 1983 claim" [further citation and quotation marks omitted]).

Although it is a close question, the Court additionally finds that Deputy Moll did not act with deliberate indifference by failing to redress these conditions because it marginally credits his testimony that he made no effort to become apprised of Plaintiff's general condition at the time of these checks. Accordingly, the Court does not infer Deputy Moll's deliberate indifference from his apprehension of an obvious risk to Plaintiff and, in the absence of any other direct evidence of his mental state, the Court concludes that his personal participation in the provision of the unconstitutional conditions was at most negligent. *Cf. DeSpain*, 264 F.3d at 975.

> *(3)* <u>*Deputy Meeks*</u>

Lastly, as found above, Deputy Meek's only interaction with Plaintiff was to place a sack lunch on his lap on November 9, 2005, after the Plaintiff indicated that he was hungry.

The Court finds that Deputy Meeks personally participated in the provision of the unconstitutional conditions confinement in the emergency restraint chair by failing to redress these conditions during this encounter. *Maynard*, 80 F.3d at 1441. Nonetheless, the Court additionally finds that Deputy Meeks did not act with deliberate indifference through this omission because no evidence suggests that he was ever aware of Plaintiff's general condition. *Cf. DeSpain*, 264 F.3d at 975.

### c.    Damages

Having found Sergeant Esters liable on Plaintiff's conditions of confinement claim, the Court turns to the proper measure of damages.

Under the Prison Litigation Reform Act ("PLRA"), no federal civil rights action may be brought by a prisoner for mental or emotional injury suffered while in custody without a prior showing of physical injury.  42 U.S.C. § 1997e(e) (2006).  Nonetheless, the threshold for "physical injury" is likely not high.  *See, e.g.*, *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997) (suggesting that the threshold must be more than *de minimus*, but need not be significant).

Plaintiff testified that he suffered anger, fear, humiliation, and other mental and emotional injury relating to his restraint in the emergency restraint chair.  Plaintiff also testified, that the prolonged restraint in this chair prevented his legs from working properly upon release.  The Court finds that such physical injury is sufficient under the PLRA to entitle Plaintiff to compensatory damages for his mental and emotional injury.[19] The Court finds that Plaintiff is entitled to compensatory damages for the mental and emotional injuries he proved at trial.  In section 4a above, for purposes of determining whether the conditions of confinement were justified, the Court rejected Defendants' arguments that eighteen hours' confinement in the restraint chair and forty-four hours' in the safety cell was justified due to Plaintiff's lack of cooperation and continued threat to others.  For purposes of assessing damages, however, the Court believes Plaintiff's

---

[19]    At a minimum, the Court notes that it would be compelled to grant nominal damages to Plaintiff as a result of Sergeant Esters' constitutional violation.  *See Searles v. Van Bebber*, 251 F.3d 869, 879 (10th Cir. 2001).  Because Plaintiff is entitled to compensatory damages, the Court has not awarded nominal damages.

aggressive and violent behavior, coupled with his tenacious unwillingness to cooperate with officials, contributed to his continued confinement and should be considered by this Court in determining the amount of damages awarded to Plaintiff. The Court does not believe that a plaintiff who exhibits such violent, aggressive, and threatening behavior on an ongoing basis should be rewarded with a windfall. Therefore, while the Court believes Plaintiff is entitled to some compensation for the injuries he sustained, the Court believes that $10,000 in compensatory damages is a just amount considering the totality of the circumstances of this case.

Finally, because the Court finds that Sergeant Esters' constitutional violation was not motivated by evil motive, and that it did not involve callous or reckless indifference to Plaintiff's federally protected rights, the Court finds that punitive damages would be unwarranted on the facts of this case. *See Youren v. Tintic Sch. Dist.*, 343 F.3d 1296 (10th Cir. 2003).

## CONCLUSION

Based on the foregoing, the Court hereby ORDERS that:

1.  Judgment shall enter in favor of Plaintiff Charles Lee Kettering, and against Sergeant Michael Esters, on Claim IV in the amount of $10,000.00;

2.  Claim IV shall be DISMISSED WITH PREJUDICE as asserted against Defendant Deputy Clyde Meeks and Defendant Deputy Robert Moll; and

3.      Claims III, V, and VI shall be DISMISSED WITH PREJUDICE as asserted against all remaining Defendants.

DATED:  February    27   , 2009

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge